UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2019 AUG 14   AM 11: 43

CLERK

BY_____
DEPUTY CLERK

| | | |
|---|---|---|
| TIMOTHY FORD, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION FILE NO. 2:19-CV-142 |
| | ) | |
| QUORUM HEALTH RESOURCES, LLC | ) | |
| d/b/a "QUORUM HEALTH," | ) | |
| SCOTT TOWLE, WILLIAM HOLMES, | ) | |
| MICHAEL HALSTEAD and | ) | |
| WAYNE SCHOLZ, GEORGE LAMB, | ) | |
| RICHARD DEXTER, III, | ) | |
| STEPHEN LYON, ERIC BIBENS, II, | ) | |
| JOSHUA DUFRESNE, ROBERT FLINT, | ) | |
| JOHN BOND, | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff Timothy Ford makes the following complaint against the above-named Defendants:

### SUMMARY

1.    Before encountering the defendants, Mr. Ford resided with his family in North Carolina, where he held secure positions as the Chief Executive Officer of a stable and established hospital and the Senior Vice President of Corporate Services for a stable and established health care system, and served as an adjunct professor at Appalachian State University.

2.    In September 2013, Plaintiff Timothy Ford was recruited for the positions of President and Chief Executive Officer of Springfield Medical Care Systems, Inc. ("SMCS") and Springfield Hospital in Springfield, Vermont, and he served faithfully and effectively in those positions from November 2013 through December 2018.

PAUL FRANK + COLLINS P C
ATTORNEYS AT LAW
P.O Box 1307
BURLINGTON, VERMONT 05401

3.    As a result of the defendants' unlawful and malicious actions alleged herein, Mr. Ford became suddenly, unexpectedly and unfairly unemployed in December 2018, and since then has had no income, his public image and professional reputation have been unjustly tarnished, his career and personal well-being have sustained grievous and potentially permanent injury, and SMCS and Springfield Hospital are now in bankruptcy at serious risk of liquidation.

## PARTIES

4.    Mr. Ford is presently a resident of the State of South Carolina.

5.    Defendant Quorum Health Resources, LLC ("Quorum") is a business entity with its principal place of business in Brentwood, Tennessee, and its registered agent at CT Corporation System, 17 G W Tatro Drive, Jeffersonville, VT 05464-9919.

6.    Defendant Scott Towle is employed by Quorum as Associate Vice President, Strategic Integrated Resources Group, and is an adult resident of the State of Maine.

7.    Defendant William (Chip) Holmes is employed by Quorum as Associate Division Vice President, and is an adult resident of Addison County, Vermont.

8.    Defendant Wayne Scholz is employed by Quorum as Associate Vice President, and is an adult resident of the State of Texas, and at relevant times held the position of Interim CFO of SMCS.

9.    Defendant Halstead is employed by Quorum as its Vice President East Operations, and at relevant times held the position of "Interim CEO" of Springfield Hospital, and is a resident of the State of Tennessee.

10.    Quorum, Scholz, Towle, Halstead and Holmes are referred to herein as the "Quorum Defendants."

PAUL FRANK + COLLINS P C.
ATTORNEYS AT LAW
BURLINGTON, VERMONT

11.    SMCS is a Vermont corporation with its principal place of business in Springfield Vermont, where it operates Springfield Hospital, and is presently the Debtor in a voluntary Chapter 11 Bankruptcy Petition, Case No. 19-10285, which Defendants caused to be filed on June 26, 2019.

12.    Defendants George Lamb, Richard Dexter, III, Robert Flint, John Bond, Eric Bibens and Stephen Lyon are adult residents of Vermont, and at relevant times were members of the SMCS Governing Board.   At relevant times, Defendant Lamb was the Chairperson of the SMCS Board, Defendant Dexter was its Treasurer, and Lyon was the Secretary.

13.    Defendant Dufresne is an employee of SMCS, and at relevant times held the positions of Acting CEO and HRSA Project Director of SMCS, as well as a position on the SMCS Board of Directors.

14.    SMCS, Lamb, Dexter, Flint, Bibens, Bond, Dufresne and Lyon are referred to collectively herein as the "SMCS Defendants."

## JURISDICTION AND VENUE

15.    This action is subject to this Court's jurisdiction pursuant to 28 U.S.C. § 1332 as the matter in controversy exceeds $75,000 and is between citizens of different states.

16.    This court is the proper venue for this action as the events and transactions at issue took place, material evidence is situated, and many of the defendants are domiciled within this federal judicial district.

## FACTS

### A.  The Contract

17.    In 2013, SMCS, like many smaller, rural independent hospitals, was experiencing chronic financial challenges.

PAUL FRANK + COLLINS P.C.
ATTORNEYS AT LAW
BURLINGTON, VERMONT

18.    On or about September 6, 2013, SMSC and Mr. Ford entered into a written contract setting forth terms and conditions of Mr. Ford's employment by SMCS, commencing November 1, 2013 (the "Contract").

19.    Material terms of the Contract were that Mr. Ford would receive "full salary and benefits for twelve months as a severance benefit if SMCS terminates your employment without cause," but would not receive any severance benefit "if you terminate your employment voluntarily or SMCS terminates your employment for cause."

20.    On information and belief, all of the defendants, at relevant times, had actual and/or constructive knowledge of the Contract and its material terms.

**B. Mr. Ford performed the duties of his position loyally, competently and effectively.**

21.    When Mr. Ford began his service to SMCS in November 2013, SMCS had a negative operating margin, and its primary lender, Peoples United Bank was threatening to call the loan.

22.    In 2014, Mr. Ford reported to the SMCS Board of Directors that SMCS owed Medicare/CMS $2.5 million resulting from longstanding accounting practices at SMCS under successive CEOs prior to Mr. Ford.

23.    Early in Mr. Ford's tenure, in conversations with Defendant Dufresne and other SMCS officials, Mr. Ford learned of two significant financial burdens which could not be considered in any cost-cutting strategy because Defendants Lamb, Bibens and Flint had personal and/or financial interests in them. First was SMCS' relationship with the development at 100 River Street, where SMCS had contributed funds to the property development and pays rent far in excess of market rates. Second was SMCS' ownership of the property it leases to the Edgar May Recreation Center. On information and belief, SMCS' former CEO resigned after being instructed

PAUL FRANK + COLLINS P.C.
ATTORNEYS AT LAW
BURLINGTON, VERMONT

by Bibens and Lamb to approve the purchase of the property, which the CEO opposed because of significant potential environmental liabilities attached to the property.

24. By fiscal year end 2015, under Mr. Ford's leadership, SMCS' financial situation had improved sufficiently that SMCS was able to refinance its debt with the USDA and Berkshire Bank.

25. From 2015 through early 2017, under Mr. Ford's leadership, SMCS continued to experience positive financial results primarily due to increases in revenue from adding providers and retaining patients, and Mr. Ford received consistently positive performance reviews from the Board of Directors.

26. In 2016, the SMCS Board awarded Mr. Ford a significant 33% raise in his compensation, due to his performance and to maintain market competiveness to retain Mr. Ford. On information and belief, a motion was made at a SMCS Board meeting to formally commend Mr. Ford for his performance, but the motion failed after Defendant Lamb objected because "we might need to fire him."

27. During FY 2018, over half of the hospitals in Vermont, including Gifford, Copley, and Brattleboro Memorial, and SMCS, were operating with a negative margin due to a variety of challenges, including physician shortages, decreased revenue, increased expenses for locums tenens coverage and health insurance increases, and a recalculation of monthly payments by Vermont's Accountable Care Organization, OneCare Vermont.

28. In response to these challenges, in FY 2018, Mr. Ford, in consultation with his executive team, formulated and began to implement a turn-around plan to improve SMCS' "bottom line" by over $7 million. The turn-around plan would, among other things:

    a. Change the ED provider contractor ($1.5M);
    b. Increase ED reimbursement with a new system documenting stand-by time ($700,000 - $1M), used successfully by new ED contract providers;

PAUL FRANK + COLLINS P C
ATTORNEYS AT LAW
BURLINGTON, VERMONT

c. Add a dentist and close a medical practice at a clinic in Chester, VT that was not generating sufficient volume, and 80% of the community was not using that location for primary care ($260,000);

d. Change the benefit plan to eliminate the opt-off discount and change the stop-loss carrier ($400,000);

e. Achieve a 5% rate increase from the GMCB ($1.5M);

f. Obtain additional DSH (Disproportionate Share Hospital) payment ($600,000);

g. Use fewer MDs and more CRNAs for anesthesia ($400,000);

h. Add a urologist to meet needed capacity and volume ($1M);

i. Achieve a settlement with OneCare due to successful ACO participation results in 2018 (capped at $1M);

j. Not replace three PAs in practices by more efficient use of existing providers ($330,000);

k. Achieve a FY 2018 Cost Report settlement due to lower volume ($775,000 - $1M);

l. Negotiate a new pathology contract with Cheshire Dartmouth-Hitchcock ($60,000);

m. Develop internal marketing plan to increase surgical referrals from primary care clinics;

n. Implement more efficient nurse staffing model in the inpatient care unit;

o. Work with administrative team to achieve further reductions in primary care medical staff based on productivity;

p. Engage a consultant to advise on strategy, operations, and financial analysis, and to identify potential additional cost-savings and/or revenue enhancement.

29. As part of the strategic plan Mr. Ford also began discussions with officials at Dartmouth Hitchcock Medical Center to identify other potential solutions, possibly including some manner of affiliation.

30. Some of these changes, especially the closure of the Chester practice and the new ED contract, provoked aggressive and hostile opposition by a cadre of individuals with personal or financial interests in the status quo, including the Defendant Bond, who organized and spearheaded the effort.

31. These individuals, including Defendant Bond, for their own personal and financial interests, engaged in a campaign to publicly disparage Mr. Ford in order to interfere with his contract with SMCS through personal attacks and false assertions made in the public session of a SMCS Board Meeting, some of which were published in local media.

PAUL FRANK + COLLINS P C
ATTORNEYS AT LAW
BURLINGTON, VERMONT

32. The SMCS Board, including Defendants Lamb, Dexter, Flint and Lyon, instructed Mr. Ford not to engage with or respond to this group of belligerents and promised to stand behind him.

## C. The Quorum consulting contract.

33. Throughout Mr. Ford's tenure, he and the SMCS Board relied heavily on Scott Whittemore, who served as Controller when Mr. Ford was hired and was subsequently promoted to CFO. Mr. Whittemore is a CPA, holds a Master's degree, and has extensive knowledge of critical access hospital, FQHC, and 340(B) Pharmaceutical program finances – a rare combination.

34. Mr. Whittemore provided financial reports at monthly meetings of the SMCS Board's Finance Committee and at meetings of the full Board, and provided an annual Budget Report to the Green Mountain Care Board each August. Mr. Whittemore's monthly reports were also provided to GMCB, Berkshire Bank and the Boards of SMCS and Springfield Hospital. In addition, he would informally provide information to Mr. Ford, and he would respond to periodic requests from the Board or Board members for specific information.

35. SMCS' line of credit with Berkshire Bank requires SMCS to maintain three covenants, relating to cash on hand and liquidity ratios. Mr. Whittemore's monthly reports included a "pass/fail" assessment of each of these covenants. On one or more occasions, Mr. Whittemore, who managed SMCS' relationship with the Bank, informed the Finance Committee of the Bank's possible responses if SMCS' annual audit confirmed a failure to meet the covenants for the fiscal year, which could include calling the note, waiving the failure if the Bank was convinced that SMCS had a viable plan for improving its financial position, or requiring SMCS to engage an outside consultant to assess SMCS' operations and finances.

PAUL FRANK + COLLINS P C
ATTORNEYS AT LAW
BURLINGTON, VERMONT

36.    In FY 2017, SMCS failed one of the covenants, but the Bank agreed to waive the failure because it appeared that federal grant money had not been included in the calculation, the inclusion of which would reduce the deficiency.

37.    One of the covenants required SMCS to maintain cash on hand to fund operations for 70 days. Mr. Whittemore reported to the SMCS Finance Committee and the Board that SMCS had approximately 60 days cash on hand during the summer of 2018, which had dipped to approximately low 50's by the fall, and predicted that SMCS would likely fail one or more of the covenants at fiscal year-end.

38.    Mr. Ford decided to engage an outside consulting firm before the annual audit without waiting for a formal request from the Bank. He contracted with Quorum to provide consulting services for a three-month period, beginning in December, after the completion of the FYE audit.

39.    Mr. Ford would not have engaged Quorum to provide management services to SMCS, as Quorum-managed and Quorum-owned hospitals have a well-reported record of failure. Quorum has also been alleged to have altered hospital financial statements to disguise losses, and has paid over $18 million to settle at least two claims of Medicare fraud. In 2008, Quorum paid $4 million to settle a claim brought by an orthopedic surgeon at a Quorum-managed hospital in Vermont. In 2016, Quorum's parent company was sued by investors for providing false and misleading public statements and failing to disclose the poor performance of its hospitals. Quorum's operating loss for the second quarter of 2019 was $26.6 million, which is reportedly more than double its losses in 2018. Quorum has reportedly lost over 85% of its value since being listed on the stock exchange in 2016 and its shares have fallen more than 40%. Its largest shareholders have filed papers with the Securities and Exchange Commission seeking a more active role in pushing for

PAUL FRANK + COLLINS P.C
ATTORNEYS AT LAW
BURLINGTON, VERMONT

changes in Quorum's strategy and plans, corporate governance, and other areas, and Quorum

management responded by announcing plans to close or sell its worst performing hospitals.

https://www.nashvillepost.com/business/area-stocks/article/21066310/wall-street-giant-goes-active-

on-quorum; https://www.nashvillepost.com/business/area-stocks/article/21064157/big-investor-

goes-active-on-quorum; https://www.beckershospitalreview.com/finance/quorum-s-net-loss-

shrinks-to-16-9m-in-q2.html.

40.     Mr. Ford engaged Quorum to provide a fresh perspective, and trusted Quorum to

provide suggestions and recommendations that would be subject to review and assessment by Mr.

Ford and the SMCS executive team before they could be implemented.  Mr. Ford also hoped that

Quorum's analysis would help SMCS to identify adjustments to its revenue cycle to maximize

revenue and reimbursement, and to evaluate continued participation in the ACO.  He did not trust

Quorum to manage SMCS as a going concern.

41.     In late November, 2018, Defendant Lamb provided Mr. Ford with a written

Performance Evaluation by seven members of the SMCS Board of Directors, which had nine

members at the time.  The majority of Board members rated Mr. Ford "Excellent" or "Good" – the

two highest ratings available – for all criteria.  For example:

a.  For the criterion, "Provides effective leadership and direction to the hospital staff,"
    four members rated him "Excellent," one rated him "Good," and one had "No basis
    for judgment."
b.  For the criterion, "The CEO is a person of integrity," five members rated him
    "Excellent" and two rated him "Good."
c.  For the criterion, "Handles problems in a professional manner," four members rated
    him "Excellent" and three rated him "Good."
d.  For the criterion, "Assures that hospital is in accordance with applicable standards,
    codes, laws and regulations," five members rated him "Excellent" and two rated him
    "Good."
e.  For the criterion, "Anticipates trends and opportunities affecting hospital operations
    and develops an appropriate and timely response," five members rated him
    "Excellent" and two rated him "Good."

PAUL FRANK + COLLINS P C
ATTORNEYS AT LAW
BURLINGTON, VERMONT

f. For the criterion, "Assesses the hospital financial condition, providing complete reports to the board of trustees on a monthly basis," five member rated him "Excellent," one rated him "Good," and one had "No basis for judgment."

g. For the criterion, "Creates a sense of trustworthiness in board/CEO relations," five members rated him "Excellent," and two rated him "Good."

h. For the criterion, "Promotes the mission of the hospital," five members rated him "Excellent" and two members rated him "Good."

i. For the criterion, "Has the respect of his peers in local and state health care organizations," four members rated him "Excellent," one rated him "Good," and two had "No basis for judgment."

## D. Mr. Ford fires the CFO for gross misconduct.

42. When Mr. Ford was hired, Mr. Whittemore had been serving SMCS for over twenty years, and had proven himself to be highly competent, trustworthy and reliable. The financial statements he prepared were audited annually, on a line by line basis, by an outside auditing firm, and in conversations with Mr. Ford the auditors commended the quality and accuracy of Mr. Whittemore's financial reports. Mr. Ford, GMCB, the SMCS Board, and the Bank trusted Mr. Whittemore, with good reason.

43. On Friday, November 30, 2018, SMCS' auditor informed Mr. Ford that the FY 2018 audit revealed that SMCS had not made payroll tax payments from July through September 2018. The auditor stated that she had spoken with Mr. Whittemore, who informed her that he had personally made the decision not to pay the payroll taxes on time and to wait for an anticipated Medicare reimbursement payment, and had withheld this information from Mr. Ford and the Board of Directors, and that he had declined her request that he meet with her and Mr. Ford. Mr. Ford asked her to provide a letter confirming all of this, along with the supporting data. On Saturday, December 1, 2018, the auditors provided the letter and support, and informed Mr. Ford that the estimated unpaid taxes totaled $3.8 million, with estimated penalties and interest of $600,000.

PAUL FRANK + COLLINS P C
ATTORNEYS AT LAW
BURLINGTON, VERMONT

44.    The financial reports Mr. Whittemore had submitted for the three months in which he had not paid payroll taxes showed the payroll taxes as paid, and thus Whittemore deliberately misrepresented SMCS' financial condition to Mr. Ford, the Board and the regulators.

45.    Mr. Ford understood that SMCS' failure to pay and properly account for payroll taxes was unlawful. Mr. Ford also knew that until Mr. Whittemore's misconduct was discovered by the auditors and reported to Mr. Ford, SMCS' officers and directors had no reason to question the accuracy of Mr. Whittemore's financial reports, which had proved consistently reliable and had been subjected to annual independent audits for many years.

46.    Mr. Ford immediately informed Defendant Lamb of the situation, and of his intention to terminate Mr. Whittemore's employment, effective immediately, and Lamb expressed his approval.  Mr. Ford and SMCS' HR Director, Janet Lyle, met with Mr. Whittemore on Monday morning, December 3, 2018 and terminated his employment.

47.    Mr. Ford then engaged SMCS' auditing firm to attempt to negotiate a resolution of the payroll tax violation with the IRS.

48.    Mr. Ford and Mr. Lamb agreed to obtain a forensic audit of SMCS' financial records to determine the full extent of Mr. Whittemore's malfeasance.

49.    Defendant Holmes advised that Quorum could provide an interim CFO very quickly, which Mr. Ford agreed was probably necessary because SMCS had nobody else qualified and available to assume the responsibilities of the CFO during the search for a new CFO.

50.    In light of the record of failure of hospitals owned or managed by Quorum, Mr. Ford would not have approved of hiring a Quorum employee as an interim CFO had he not expected and intended to remain as CEO.

PAUL FRANK + COLLINS P.C.
ATTORNEYS AT LAW
BURLINGTON VERMONT

51. On Monday, December 3, 2018, Mr. Ford published a "CEO Update" memorandum to all SMCS employees re: "SMCS Leadership," in which he truthfully disclosed "the departure of Chief Financial Officer Scott Whittemore, effective today," and reported that "we will be announcing an interim replacement shortly and will begin a search for a new CFO." This memo summarized SMCS' financial challenges, reported that "we have identified several action steps to help improve our financial performance," and advised that "careful review of our ongoing fiscal challenges prompted us to initiate a contract with Quorum Health Resources in October 2018" to "provide us with an objective assessment of our system and conduct an in-depth analysis of our operations and finances," with a report expected by January/February 2019.

**E. Defendants conspire to remove Mr. Ford to evade accountability and oversight.**

52. On information and belief, unbeknownst to Mr. Ford, some or all of the individual Quorum Defendants began soliciting the SMCS Defendants to remove Mr. Ford in order to remove effective oversight of Quorum recommendations and activities, including the placement of Quorum employees in CEO positions, which Mr. Ford would not have approved.

53. During the first week of December, Mr. Ford scheduled a meeting for December 17, for Lamb, Mr. Ford, and SMCS' consulting attorney, to meet with members of the Green Mountain Care Board.

54. Mr. Ford advised Lamb and the SMCS consulting attorney that it was his intention to provide full and accurate disclosure to the GMCB respecting a number of issues, including SMCS' failure to pay payroll taxes and the termination of the CFO for submitting false and misleading financial reports, the liabilities for interest and penalties, the plan for a forensic audit, the engagement of the auditing firm to attempt to negotiate a resolution with the IRS, the failure to satisfy the covenants with Berkshire Bank, and the resistance to necessary cost-cutting measures by

PAUL FRANK + COLLINS P.C.
ATTORNEYS AT LAW
BURLINGTON, VERMONT

individuals and groups with vested interests in the status quo, reflected in the interference and personal attacks by ESNE personnel and supporters, spearheaded by Defendant Bond. Mr. Ford also recommended informing the GMCB of the turn-around plan already underway, including the new ED contract and the engagement of Quorum, and seeking the assistance of the GMCB.

55.    On information and belief, some or all of the Defendants conspired and agreed not to provide the full disclosure Mr. Ford had recommended and intended.

56.    In or about the first week of December, Defendants Lamb and Dexter, and possibly one or more of the other SMCS Defendants, met with Quorum and one or more of the Quorum Defendants without Mr. Ford.

57.    On information and belief, the Quorum Defendants recommended or encouraged the immediate removal of Mr. Ford, without notice or cause, and advised or encouraged the SMCS Defendants to withhold Mr. Ford's severance payments and to use the funds to pay Quorum employees as "interim" administrators.

58.    On information and belief, Defendants conspired and agreed to coerce Mr. Ford's resignation by threatening to terminate him if he did not resign immediately, without any warning, and without providing him with any opportunity to consult with an attorney or to otherwise protect his interests, with the expectation and intention that this would cause Mr. Ford to suffer such severe and extreme mental and emotional distress that he would tender his resignation.

59.    On information and belief, Defendants conspired and agreed to conceal their plan from Mr. Ford, in order to deprive him of the opportunity to consult with legal counsel and otherwise protect his interests, and to prevent him from participating in the meeting he had scheduled with the GMCB and SMCS' consulting attorneys.

PAUL FRANK + COLLINS P.C
ATTORNEYS AT LAW
BURLINGTON, VERMONT

60.     On information and belief, Defendants conspired and agreed to remove Mr. Ford in order to prevent him from providing full disclosure to the GMCB, to remove him from oversight of their activities, to attempt to scapegoat him for SMCS' financial condition, to claim credit for themselves for his initiatives, and to otherwise insulate themselves from accountability and potential liability.

61.     On information and belief, Defendants conspired and agreed to withhold Mr. Ford's severance payments in order to free up funds to pay Quorum for its "interim" management services, and to deprive Mr. Ford of financial resources he would need to deploy an effective legal challenge to Defendants' actions.

62.     On Saturday, December 8, 2018, an article appeared in the Valley News indicating that a report provided by Springfield Hospital officials to the GMCB on Thursday, December 6, "outlined the challenges the hospital is facing." Any report by SMCS officials to the GMCB on Thursday, December 6, 2018, was made without Mr. Ford's knowledge or input.

63.     The December 8, 2018 article quoted a SMCS spokesperson as stating "We've got a plan." The only specific aspects of the "plan" identified were the new Emergency Department contract with BlueWater and the contract with Quorum, both of which were Mr. Ford's initiatives.

64.     On Tuesday, December 11, 2018, Mr. Ford attended the regular monthly meeting of the Board of Directors, at which Mr. Ford delivered the CEO report and the Controller delivered the financial report. No member of the Board expressed any dissatisfaction with Mr. Ford's report or his overall job performance.

65.     On December 12, 2018, at approximately 7:00 a.m., Mr. Ford received a text message from Defendant Lamb, who advised that he would be stopping by Mr. Ford's office at 8:30

PAUL FRANK + COLLINS P.C
ATTORNEYS AT LAW
BURLINGTON, VERMONT

a.m., without providing any indication as to the purpose of the visit. Defendants Lamb and Dexter arrived at Mr. Ford's office together, and demanded his resignation.

66. Mr. Ford asked for an opportunity to consult with his wife and an attorney before making his decision, but Lamb and Dexter instructed Mr. Ford that if he did not tender his "resignation" within the next fifteen minutes, he would be terminated. Mr. Ford and his wife called several attorneys but were unable to speak with one within the fifteen minute deadline. Shocked, confused and distraught, Mr. Ford concluded that he had no choice but to resign in order to avoid being publicly disparaged and humiliated by being terminated, and he so informed Lamb and Dexter.

67. Because SMCS did not terminate Mr. Ford's employment, but demanded that he terminate his own employment, and Mr. Ford did not terminate his employment voluntarily, pursuant to the clear and unambiguous term of his Contract, Mr. Ford was entitled to receive "full salary and benefits for twelve months as a severance benefit."

68. Nevertheless, Lamb and Dexter handed Mr. Ford a letter – which was dated December 12, 2018 and was not on SMCS letterhead – which asserted that "[u]nder the circumstances of your separation from employment and the terms of the letter, there will be no severance benefits."

69. Mr. Ford was then compelled to leave the premises immediately. Mr. Ford's access to the SMCS computer network, email and intranet was disabled immediately, and he was unable even to access SMCS' policies and procedures.

70. On information and belief, Defendant Lamb consulted with Defendant Bibens regarding the plan to remove Mr. Ford, and Mr. Bibens approved the plan, although he held no formal position with SMCS at that time.

PAUL FRANK + COLLINS P C.
ATTORNEYS AT LAW
BURLINGTON, VERMONT

71.    Defendants have subsequently induced and/or caused SMCS to engage in a repeated and continuing breach of its contractual obligation to pay Mr. Ford "full salary and benefits for twelve months" following his involuntary resignation.

72.    Upon information and belief, immediately after meeting with Mr. Ford, Lamb, Flint and Dexter met with SMCS department managers and senior staff at the regularly scheduled daily 9 am meeting/ briefing without Mr. Ford.  Upon information and belief, at this meeting, Lamb, Dexter and Flint issued a "gag order" prohibiting all employees from contacting or speaking with Mr. Ford, the media, or anyone outside SMCS, in order to permit Defendants to advance their own false and misleading narrative and avoid full transparency with the public, the media, and the regulators.

73.    Attached to the December 12 letter provided to Mr. Ford by Defendant Lamb was a press release with a header "DRAFT FOR REVIEW 12.11.18 – Updated 11pm."  On information and belief, on or about December 12, 2018, Defendants published this press release to media outlets, with the intention and expectation that the information would be published to the general public.

74.    The Press Release was intended to, and did, cast Mr. Ford in a false light by suggesting, expressly and/ implicitly, that he was either being removed for serious performance issues or that he was abruptly abandoning Springfield Hospital in its time of need for his own personal reasons, rather than continuing to guide the hospital through its challenges and supervising the turn-around measures he had begun to implement.

75.    The truth, which Defendants intended to and did obscure, was that Mr. Ford was fully engaged, willing, capable, and desired and intended to lead SMCS through its financial crisis by marshalling the turn-around measures he had already recommended and implemented, including the new ED contract and the Quorum consulting agreement, and any additional measures that might

PAUL FRANK + COLLINS P C
ATTORNEYS AT LAW
BURLINGTON, VERMONT

be identified by Quorum or otherwise; that removing Mr. Ford was not necessary to provide a "fresh perspective" as Mr. Ford had already engaged Quorum for that purpose, and would not "provide stability" but would further destabilize an already unstable situation; that Mr. Ford had terminated the CFO for failing to pay payroll taxes and providing false and misleading reports to Mr. Ford, the SMCS Board and the GMCB; and that the Defendants, and not Mr. Ford, were responsible for Mr. Ford's abrupt departure and its consequences, including the confusion and uncertainty it would inevitably cause, and for the consequences of the Defendants' failure to follow Mr. Ford's recommendation to provide full disclosure to the GMCB.

76.    Defendants intended to and did cast Mr. Ford in a false light in order to evade their own accountability and potential liability, to claim credit for themselves for the effective measures Mr. Ford had already recommended and/or implemented, and to attempt to blame "prior administration" for their failures.

77.    Defendants reinforced the false narrative over the ensuing months through statements to regulators and news media.

78.    Multiple subsequent reports in the media demonstrate that Mr. Ford was, in fact, cast in a false light.

79.    Defendants caused SMCS to breach its contract with Mr. Ford and to cast him in a false light not to further SMCS' interests, but as part of a campaign to shield themselves from their own accountability and/or liability.

80.    On information and belief, the Quorum Defendants also recommended and encouraged Mr. Ford's termination and SMCS' false public relations narrative in order to further their own business interests in placing Quorum employees in CEO and CFO positions at SMCS and Springfield Hospital, free of effective oversight.

PAUL FRANK + COLLINS P.C.
ATTORNEYS AT LAW
BURLINGTON, VERMONT

81.    Defendant Bond later joined the SMCS Board and, on information and belief, as a member of the Board, has caused SMCS to continue to breach its contractual obligations to Mr. Ford to retaliate against Mr. Ford for terminating the costly contract with ESNE in which Bond had a personal interest.

82.    SMCS has been mismanaged since Mr. Ford's removal due to a lack of competence and conflicts of interest on the part of some or all of the Individual Defendants, and due to the removal of Mr. Ford's oversight.

83.    On information and belief, some of the Individual Defendants met with the GMCB representatives, but did not provide the transparency and accountability Mr. Ford had recommended.

84.    The unexplained removal of Mr. Ford and the misleading statements and omissions in statements made to news media and regulators, followed by a continuing lack of transparency and accountability, fostered uncertainty and mistrust, which exacerbated the already serious financial challenges facing SMCS, and was compounded by mismanagement that can only be attributed to a lack of competence and/or conflicts of interest on the part of Individual Defendants, all of which has continued to cast Mr. Ford in a false light.

85.    On information and belief, on or about December 19, 2018, state officials made a number of statements which confirm that Defendants had not provided the full disclosure and accountability Mr. Ford had recommended, and continued to place Mr. Ford in a false light. For example:

a.    Kevin Mullin, head of the GMCB, said that "officials were only starting to get a sense of what was happening with the hospital's finances and why the chief financial officer and chief executive officer abruptly resigned this month."

PAUL FRANK + COLLINS P.C.
ATTORNEYS AT LAW
BURLINGTON, VERMONT

b. Mr. Mullin stated that "at the moment, there was no evidence of misconduct by anyone at the hospital."

c. Human Services Secretary Al Gobeille stated that "he was still trying to figure out why Springfield's CEO and CFO were abruptly shown the door."

86. On or about January 10, 2019, Defendant Lamb wrote a letter to the Governor, which the Governor had requested due to a lack of response from the SMCS Board, in which Lamb stated that he was "counting on help from the state and federal governments." Mr. Gobeille stated that the letter did not provide sufficient detail to "understand their actual predicament and have confidence that their plan can be implemented."

87. On or about January 10, 2019, VT Digger reported that the board had signed a new agreement with Quorum for "advisory, consulting and interim leadership services." The article also reported that Quorum had been reviewing [SMCS'] finances since December," and that the "day Quorum started working with the hospital, Springfield Hospital Chief Financial Officer Scott Whittemore resigned. Ford resigned about a week after that. It's unclear what led to their resignations and whether Quorum's presence was part of that." Both Gobeille and Huebner stated that they did not know what led to the resignations. Gobeille stated, "[s]omething doesn't add up. What it is, I can't say." He suggested that "holding the hospital accountable and conducting a forensic audit are future possibilities."

88. Thus, as of January 10, 2019, the Defendants had still not provided the full disclosure, transparency and accountability or begun the forensic audit that Mr. Ford had recommended and intended a month earlier.

89. Before he was removed, Mr. Ford knew that it would be necessary for SMCS to pursue opportunities for early affiliation with a larger system, through discussions with Dartmouth

PAUL FRANK + COLLINS P.C.
ATTORNEYS AT LAW
BURLINGTON, VERMONT

Hitchcock Medical Center, UVM Medical Center, and state regulators. He also intended to work with the state, to negotiate higher Medicaid Disproportionate Share payments, and with DHMC, to support the Childbirth Center, due to the need in SMCS' patient population, and capacity issues at DHMC. Mr. Ford understood the importance of those efforts to maintaining trust and credibility with the leaders.

90.    Prior to his removal, Mr. Ford had scheduled a meeting with officials at Dartmouth-Hitchcock Medical Center for January 16, 2019. On information and belief, a meeting with these officials was attended by Lamb, Dufresne and Bibens. Shortly before or after that meeting, Mr. Bibens had formally been appointed to the SMCS Board. On information and belief, the DHMC team elected not to pursue serious discussions due to a loss of trust and confidence in SMCS' leadership and credibility.

91.    In or about January or February 2019, Defendant Bond was permitted to join the SMCS Board, despite his vocal, public and malicious efforts to interfere with Mr. Ford's contractual relationship with SMCS, and SMCS' contractual relationship with Blue Water Emergency Partners.

92.    On January 17, 2019, SMCS' website announced that Defendant Halstead, a Quorum employee, had been appointed as interim CEO of Springfield Hospital, Wayne Scholz, another Quorum employee, had been appointed as interim CFO of SMCS, and Joshua Dufresne had been appointed as "acting CEO" of SMCS.

93.    Dufresne lacks the qualifications or experience to serve as an effective CEO of SMCS. Prior to Mr. Ford's removal, Dufresne had been in charge of the operations of FQHC, and had continued to increase expenditures without producing sufficient offsetting revenue. Dufresne knew that one of the next items on the agenda for Mr. Ford's turn-around efforts was to focus on

PAUL FRANK + COLLINS P.C.
ATTORNEYS AT LAW
BURLINGTON, VERMONT

cost-cutting at the FQHC, by requiring providers to be more productive as a condition of renewing their contracts, and reducing support and supervisory staff.

94.     On information and belief, Dufresne was installed and serves as a figurehead CEO with no real authority, and the Defendants Lamb, Bibens, Scholz, and Halstead are serving as SMCS's executive team, with little or no effective oversight or accountability, in violation of SMCS' bylaws and federal regulations.

95.     On February 12, 2018, VT Digger reported that the forensic audit had confirmed that there had been material misstatements in Whittemore's monthly financial reporting, and that Mr. Whittemore had been terminated by Mr. Ford– facts which Mr. Ford had intended to disclose two months earlier, before he was removed, but which Defendants had concealed as part of their effort to evade accountability and to cast Mr. Ford in a false light.

96.     Mr. Ford understood that a chronic shortage of qualified health care professionals made it necessary to cut management and supervisor salaries before cutting clinical staff compensation.  He also understood that it was important to consider the longer term impact of cutting expenses on the cost report, since Springfield Hospital's Medicare reimbursement is cost-based, and reduced expenses generally lead to reduced reimbursement, after the cost report is filed.

97.     However, in February, Defendants made the reckless and short-sighted decision to implement an across-the-board 4% pay cut, after terminating 27 staff positions, which resulted in the resignation of 35 additional employees, including 20 nurses.  Defendants were then compelled to raise compensation back to market rates in an attempt to retain nurses, nurse assistants, medical assistants and mental health workers.  On April 24, 2019, Halstead was quoted as stating that SMCS had lost 77 staff members since the beginning of February and was having difficulty staffing patient care areas, and was turning away patients, which "hurts the revenue side."

PAUL FRANK + COLLINS P C
ATTORNEYS AT LAW
BURLINGTON, VERMONT

98.     This situation impeded the efforts of Blue Water Emergency Partners, the company Mr. Ford engaged to take over emergency services at SMCS beginning in April 2019, to recruit qualified providers.

99.     On February 19, 2019, a group of more than 30 current and former Springfield Hospital staff members submitted a petition to the SMCS Board demanding the resignation of Board Chair Lamb. The Petition asked why Lamb who "stood shoulder to shoulder with Ford and appeared to be advising him closely," didn't leave at the same time. In a written statement in support of the petition, one of the proponents of the petition stated that "your blatant lack of financial oversight has put people out of work and may cost this area its hospital."

100.     Neither Lamb, Dexter, Lyon, Bond, Bibens nor any other member who served on the SMCS Board at the time Mr. Ford was removed or subsequently, have been held accountable, and Springfield Hospital has now succumbed to the same failure that has befallen many other Quorum-managed and Quorum-owned hospitals.

101.     In March 2019, the Defendants elected to close the childbirth center at Springfield Hospital on June 1, 2019. As early as October 2018, Mr. Ford had begun discussions with the director of Vermont Medicaid to increase the Medicaid rate to recognize the hospital's efforts to provide and improve prenatal care for high-risk patients to reduce the need to transfer patients to Dartmouth Hitchcock. Also discussed was a possible arrangement with Dartmouth Hitchcock to back-transfer patients to Springfield Hospital after the level of care provided at Dartmouth Hitchcock was no longer needed but the patient required continued hospitalization. This could reduce the overall cost to the State, and allow patients to receive care closer to home.

PAUL FRANK + COLLINS P C.
ATTORNEYS AT LAW
BURLINGTON, VERMONT

102.    Mismanagement since Mr. Ford's departure exacerbated persistent problems that Mr. Ford was working hard to address, and created new ones, and Springfield Hospital's very survival is now in question.

103.    In their reports to regulators and in the media, Defendants, particularly the Quorum Defendants, have falsely and unfairly attempted to claim credit for turn-around measures which Mr. Ford had recommended and begun implementing before he was replaced, and to blame their own failures on prior management and a "perfect storm" of challenges, some of which were the same challenges that were being addressed by Mr. Ford's turn-around plan that Quorum effectively adopted after assuming its purportedly "interim" executive control of SMCS and Springfield Hospital, and some of which were created by Quorum after removing Mr. Ford's continuing oversight.

## H. Quorum's bankruptcy strategy.

104.    On June 26, 2019, at a meeting attended by defendant Halstead, the SMCS Board, by the unanimous vote of defendants Bibens, Bond, Dexter, Dufresne, Lamb, and three other Directors, authorized SMCS to file a petition for bankruptcy protection. The June 26, 2019 Board Resolution further authorized SMCS to engage the services of Quorum Health Resources, LLC of Portland, Maine, "with respect to interim management consulting, and related services as SMCS determines appropriate," and to engage a Portland, Maine, law firm as general bankruptcy counsel in connection with the Chapter 11 case.

105.    The Petition was filed that same day, which confirms that it was prepared by Quorum and its lawyers well before it was authorized.

106.    On information and belief, although Defendant Dufresne signed the Chapter 11 Petition, SMCS' bankruptcy counsel reports to Defendant Halstead.

PAUL FRANK + COLLINS P C
ATTORNEYS AT LAW
BURLINGTON, VERMONT

107. On information and belief, in or about May 2019 one or more of the Quorum Defendants admitted that they understood that a Chapter 11 Petition for reorganization would inevitably be converted to a Chapter 7 liquidation plan, since they had cut operations to the point where SMCS and Springfield Hospital could no longer generate sufficient revenue to remain viable.

108. On June 27, 2019, Defendant Halstead published an article in the Valley News in which he falsely portrayed the Chapter 11 petitions as part of a bona fide effort to "improve their financial health and long-term viability" and "enable both organizations to continue serving patients in the region and keep jobs in the community."

109. On information and belief, when the Quorum Defendants effectively assumed control over the operations of SMCS and Springfield Hospital, consistent with Quorum's pattern and practice with other financially challenged hospitals, the Quorum Defendants planned, expected and/or intended to cause SMCS pay themselves for implementing short-sighted cost-cutting measures which were guaranteed to drive SMCS and Springfield Hospital into bankruptcy, and then continue to pay themselves out of the bankrupt estate as "administrative expenses."

110. On information and belief, the Quorum Defendants failed to disclose their true intentions and/or expectations, in order to induce SMCS and Springfield Hospital to engage the Quorum Defendants to provide "interim management" services, to pay the Quorum Defendants salaries and fees while they drove SMCS and Springfield Hospital into bankruptcy, and then continue to pay their salaries and fees as administrative expenses for as long as possible after filing the bankruptcy petitions, with the expectation and/or intention that the Quorum Defendants would be able to walk away and return to their home states or other Quorum operations when it was no longer possible to extract any more funds from SMCS or Springfield Hospital.

PAUL FRANK + COLLINS P C.
ATTORNEYS AT LAW
BURLINGTON, VERMONT

111.    On information and belief, Quorum induced SMCS to breach Mr. Ford's Contract and conspired with the other Defendants to cast Mr. Ford in a false light in order to remove Mr. Ford from oversight of Quorum's activities, so that Quorum could implement its plan.

**I.    Mr. Ford's efforts to salvage his career.**

112.    Because hospital CEOs commonly serve multiple successive institutions over the course of a career, they are targeted by recruiters and professional "headhunters" seeking to establish connections with institutions in need of new leadership. Mr. Ford has been targeted by recruiters and "headhunters" throughout his career, including while he was serving SMCS. Through these contacts, in October/November 2018, Mr. Ford was made aware of two hospitals that were interested in hiring him.

113.    Mr. Ford contacted these two employers after his removal from SMCS, but learned that they were no longer interested in speaking with him due to uncertainties relating to his departure from SMCS.

114.    Mr. Ford has been diligently pursuing employment opportunities, and has been interviewed for several positions, but the uncertainties created by the Defendants' actions has been a persistent impediment, and he has not yet received an offer.

115.    On December 13, 2018, a senior and long-term SMCS administrator (who, on information and belief, was subsequently removed in furtherance of Defendants' efforts to evade oversight and accountability) sent a text message to Mr. Ford stating: "I want you to know how terribly sorry I feel about your departure and that decision. Very unfair and in the end gutless. You did make us proud and you allowed us to be our very best. We will not forget and I will miss you. I wish you only the best for the future."

PAUL FRANK + COLLINS P C.
ATTORNEYS AT LAW
BURLINGTON, VERMONT

116. Otherwise, nobody from SMCS or Quorum has reached out to Mr. Ford to inquire about his well-being or to offer any assistance, support or encouragement, or to utilize his knowledge, experience and expertise.

## SUMMARY OF CLAIMS

117. The individual SMCS Board Defendants did not act in compliance with 11B V.S.A. § 8.30.

118. As a direct and proximate consequence of Defendants' actions, Mr. Ford has suffered, and will continue to suffer, substantial economic losses, including the loss of the severance payments, and a significant loss of income and earning capacity, out of pocket expenses and emotional distress, and emotional distress, humiliation and injury to his reputation, for which he is entitled to recover compensatory damages.

119. Defendants acted with a malicious and reckless disregard for Mr. Ford's rights and interests, such that an award of punitive damages is warranted.

120. Mr. Ford is also entitled to recover his costs, expenses and attorneys' fees.

## COUNT ONE: VIOLATION OF

## VERMONT FAIR EMPLOYMENT PRACTICES STATUTES, 21 V.S.A. Ch. 5

121. The foregoing allegations are incorporated by reference into this Count Two.

122. At all relevant times, Mr. Ford was SMCS' "employee" and SMCS was Mr. Ford's "employer" within the meaning of 21 V.S.A. §§ 341 (1) and (2), and § 345(a).

123. During the period of Quorum's "interim" administration following Mr. Ford's removal, the Defendants have had control of SMCS' payment operations, and are therefore also "employers" within the meaning of 21 V.S.A. § 345(a).

PAUL FRANK + COLLINS P C
ATTORNEYS AT LAW
BURLINGTON, VERMONT

124. The continuation of salary to which Mr. Ford is entitled under the Contract is remuneration for services rendered prior to his removal, and is therefore "wages" within the meaning of 21 V.S.A. § 341(5) and 342(a).

125. In each successive two-week pay period since Mr. Ford was issued his last paycheck, each of the Defendants willfully and without good cause participated, and continue to participate in, SMCS' knowing violations of Mr. Ford's right to receive the severance payments specified in the Contract, in violation of 21 V.S.A. Ch. 5.

126. Pursuant to 21 V.S.A. § 345(a) the Defendants are liable to Mr. Ford, jointly and severally, for the severance payments specified in the Contract.

127. The Defendants have failed to pay Mr. Ford the wages due to him, in violation of 21 V.S.A. §§ 342(a).

128. As of the date of this Complaint, the wages due to Mr. Ford remain unpaid.

129. As of the pay period ending August 9, 2019, the unpaid wages total $230,894.

130. The unpaid wages continue to accrue at the rate of $13,582 for each pay period after August 9, 2019.

131. The severance benefits specified in the Contract also include "benefits" that SMCS was required to provide to Mr. Ford pursuant to a written employment agreement within the meaning of 21 V.S.A. § 345(b).

132. As a direct and proximate result of Defendants' failure to pay Mr. Ford the salary and benefits to which he is contractually entitled, Mr. Ford has suffered losses and injuries for which he is entitled to recover money damages.

PAUL FRANK + COLLINS P C.
ATTORNEYS AT LAW
BURLINGTON, VERMONT

133. Pursuant to 21 V.S.A. § 345(b) the Defendants are liable to Mr. Ford, jointly and severally, for the actual damages caused by their failure to pay him the salary and benefits to which he is contractually entitled.

134. Pursuant to 21 V.S.A. § 347, Defendants are required to forfeit to Mr. Ford twice the value of the unpaid wages, and all of his costs and reasonable attorneys' fee.

## COUNT TWO:  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

135. The foregoing allegations are incorporated by reference into this Count Two.

136. The Defendants' actions with respect to Mr. Ford evidence oppressive conduct and abuse of positions of authority.

137. The Defendants' conduct was outrageous, and was done intentionally or with reckless disregard of the probability of causing Mr. Ford to suffer emotional distress.

138. As a direct and proximate consequence of the Defendants' actions, Mr. Ford has suffered and continues to suffer extreme emotional distress.

139. The Defendants are liable to Mr. Ford, jointly and severally, for compensatory damages to redress the emotional distress they have caused him to suffer.

## COUNT THREE:  INTENTIONAL AND/ OR NEGLIGENT NONDISCLOSURE

140. The foregoing allegations are incorporated by reference into this Count Three.

141. Defendants concealed their plan from Mr. Ford with the intention and effect of deceiving him into believing that SMCS would comply with the Contract, and depriving him of the opportunity to engage counsel and otherwise protect his interests.

142. In the alternative, Defendants negligently failed to disclose their plans to Mr. Ford, under circumstances where they knew or reasonably should have known that Mr. Ford was relying on the terms of the Contract, which terms were misleading in light of Defendants' secret plan.

PAUL FRANK + COLLINS P.C
ATTORNEYS AT LAW
BURLINGTON, VERMONT

143. Mr. Ford justifiably relied on the terms of the Contract, without knowledge of Defendants' secret plan.

144. As a direct and proximate result of Defendants' concealment and failure to disclose their secret plan to Mr. Ford, and his justifiable reliance on the terms of the Contract without knowledge of Defendants' secret plan, Mr. Ford was deprived of the opportunity to engage legal counsel and otherwise protect his rights and interests prior to the termination of his employment.

145. As a direct and proximate result of Defendants' concealment and nondisclosure, Mr. Ford has suffered losses and injuries for which he is entitled to recover damages.

### COUNT FOUR: TORTIOUS INTERFERENCE (QUORUM DEFENDANTS)

146. The foregoing allegations are incorporated by reference into this Count Four.

147. The Quorum Defendants intentionally interfered with Mr. Ford's contractual rights and interests under the Contract and his professional and business relationships.

148. The Quorum Defendants accomplished their interference by wrongful means, in furtherance of their own interests independent of the interests of SMCS, on behalf of themselves and not on behalf of SMCS, and without privilege.

149. As a direct and proximate result of the Quorum Defendants' interference, Mr. Ford has suffered losses and injuries for which he is entitled to recover damages.

### COUNT FIVE: TORTIOUS INTERFERENCE (SMCS DEFENDANTS)

150. The foregoing allegations are incorporated by reference into this Count Five.

151. The SMCS Defendants intentionally interfered with Mr. Ford's contractual rights and interests under the Contract and his professional and business relationships.

PAUL FRANK + COLLINS P.C.
ATTORNEYS AT LAW
BURLINGTON, VERMONT

152.    The SMCS Defendants accomplished their interference by wrongful means, in furtherance of their own interests independent of the interests of SMCS, on behalf of themselves and not on behalf of SMCS, and without privilege.

153.    As a direct and proximate result of the SMCS Defendants' interference, Mr. Ford has suffered losses and injuries for which he is entitled to recover damages.

## COUNT SIX:  DEFAMATION

154.    The foregoing allegations are incorporated by reference into this Count Six.

155.    On or about December 12, 2018, Defendant Lamb, with the knowledge and agreement of some or all of the other Defendants, published a Press Release to media outlets, who thereafter published excerpts verbatim to the general public.

156.    The statement that "SMCS Board of Directors has accepted the resignation of CEO Tim Ford, effective immediately" was false and misleading in light of the facts which were not disclosed, including the following:

a.    Mr. Ford attended the SMCS Board meeting on December 11, 2018 at which the Board expressed no dissatisfaction with his job performance and did not request, obtain or accept Mr. Ford's resignation;

b.    Mr. Ford's resignation was not voluntary, but was coerced by wrongful means by Defendants Lamb and Dexter;

c.    The SMCS Board did not meet between the time when Lamb and Dexter demanded Mr. Ford's resignation and then purported to accept it;

157.    The statements in the Press Release that "the board is fully engaged and will be working with interim leadership to immediately address and stabilize financial operational issues" and that a "new leadership team will provide stability and a fresh perspective as we continue this

PAUL FRANK + COLLINS P.C.
ATTORNEYS AT LAW
BURLINGTON, VERMONT

process" taken alone and in the context of the Press Release as a whole were false and misleading in at least the following respects:

    a. They falsely imply that Mr. Ford created the instability by abruptly resigning;

    b. They falsely imply that Mr. Ford was impeding the needed "fresh perspective" and "interim leadership" he had engaged Quorum to provide;

    c. They falsely imply that Mr. Ford was responsible for serious "financial operational issues" which could not be addressed without his removal.

158.    Alone and in the context of the Press Release as a whole, these statements falsely imply either that Mr. Ford had voluntarily and suddenly abandoned SMCS in its time of need, or that he was culpable of such serious misconduct such that his immediate removal was required.

159.    The foregoing statements are injurious to Mr. Ford's trade, business and occupation, and are therefore slander per se.

160.    Mr. Ford was not and is not a public figure.

161.    The Defendants who authorized or participated in the publication of the Press Release knew and intended that it was false and misleading, failed to exercise reasonable care to assure that it was not false or misleading, and/or otherwise acted negligently or with reckless disregard for the truth and the foreseeable consequences of the defamatory statements.

162.    Defendants were not privileged to publish the false, misleading and defamatory statements.

163.    As a direct and proximate consequence of Defendants' defamation, Mr. Ford has suffered actual harm, including impairment of reputation and standing in the community and in the health care industry, personal humiliation and mental anguish and suffering, and has sustained a loss of income and severe, ongoing and potentially permanent harm to his earning potential.

PAUL FRANK + COLLINS P C.
ATTORNEYS AT LAW
BURLINGTON, VERMONT

## COUNT SEVEN:  FALSE LIGHT INVASION OF PRIVACY

164.    The foregoing allegations are incorporated by reference into this Count Seven.

165.    Defendants gave publicity to matters that placed Mr. Ford before the public in a false light by giving him unreasonable and highly objectionable publicity that attributed to him characteristics and conduct that are false, and so placed him before the public in a false position.

166.    Defendants knew or should have known that Mr. Ford, as a reasonable person, would be justified in the eyes of the community in feeling seriously offended and aggrieved by the publicity, and were therefore negligent and/or acted intentionally or with reckless disregard to the false light in which the publicity placed Mr. Ford.

167.    Defendants were not privileged to give publicity to the matters that placed Mr. Ford in a false light.

168.    As a direct and proximate consequence of Defendants' placing Mr. Ford in a false light, Mr. Ford has suffered actual harm, including impairment of reputation and standing in the community and in the health care industry, personal humiliation and mental anguish and suffering, and has sustained a loss of income and severe, ongoing and potentially permanent harm to his earning potential.

## COUNT EIGHT:  NEGLIGENT SUPERVISION

169.    The foregoing allegations are incorporated by reference into this Count Eight.

170.    Quorum had a duty to exercise reasonable care to select, train and supervise the individual Quorum Defendants.

PAUL FRANK + COLLINS P.C
ATTORNEYS AT LAW
BURLINGTON, VERMONT

171.    Quorum knew or should have known that the individual Quorum Defendants would engage in the wrongful acts and omissions described herein, but failed to exercise reasonable care to prevent them.

172.    As a direct and proximate consequence of Quorum's negligence, Mr. Ford has suffered actual harm, including impairment of reputation and standing in the community and in the health care industry, personal humiliation and mental anguish and suffering, and has sustained a loss of income and severe, ongoing and potentially permanent harm to his earning potential.

## COUNT NINE:  CIVIL CONSPIRACY

173.    The foregoing allegations are incorporated by reference into this Count Nine.

174.    The Quorum Defendants and SMCS Defendants conspired with each other to perform the unlawful and oppressive acts alleged above.

175.    In entering into the conspiracy, the Quorum Defendants were not acting within the scope of any employment by SMCS, and the SMCS Defendants were not acting within the scope of any employment by the Quorum Defendants.

176.    The Defendants' actions were unlawful, in bad faith, and done for their own benefit.

177.    Each of the Defendants engaged in tortious acts in concert with the other Defendants pursuant to a common design, knew that the other Defendants' conduct constituted a breach of duty and gave substantial assistance or encouragement to the other Defendants tortious acts, and/or gave substantial assistance to the other Defendants in accomplishing their tortious acts and results, and are therefore liable for conspiracy.

178.    Each of the Defendants acted in furtherance of the conspiracy.

PAUL FRANK + COLLINS P C
ATTORNEYS AT LAW
BURLINGTON, VERMONT

179.    As a direct and proximate result of Defendants' conspiracy and actions taken in furtherance of the conspiracy, Mr. Ford has suffered losses and injuries for which he is entitled to recover damages.

### COUNT TEN:  PUNITIVE DAMAGES

180.    The foregoing allegations are incorporated by reference into this Count Ten.

181.    Some or all of the Defendants' conduct was deliberate, intentional and willful, manifested personal ill will toward Mr. Ford, was carried out under circumstances evidencing malice, insult and oppression, and demonstrated a wanton and reckless disregard for Mr. Ford's rights and personal well-being.

182.    The Quorum Defendants' treatment of Mr. Ford was carried out by officers of Quorum exercising their authority, and was directed and/or ratified by Quorum.

183.    Defendants are liable to Mr. Ford for punitive damages.

**WHEREFORE**, Plaintiff Timothy Ford demands judgment in his favor and against the Defendants, and:

a)  An Order requiring the Defendants to forfeit to Mr. Ford twice the value of the unpaid wages, in the amount of $13,582 for each two-week pay period since Mr. Ford received his last paycheck;

b)  Compensatory damages in an amount to be determined by the jury, for past, present and future lost income, benefits, injury to reputation, humiliation and emotional distress, and incidental and consequential damages for the costs and expenses incurred as a consequence of Defendants' actions;

c)  Punitive damages in an amount to be determined by the jury;

PAUL FRANK + COLLINS P C
ATTORNEYS AT LAW
BURLINGTON, VERMONT

d)  Interest, costs of suit, attorneys' fees, and such other further and additional legal and

equitable relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury.


DATED at Burlington, Vermont, this 14th day of August, 2019.

TIMOTHY FORD

BY:  PAUL FRANK + COLLINS P.C.

By: _____

Stephen D. Ellis
Paul Frank + Collins P.C.
One Church Street
PO Box 1307
Burlington, VT 05402-1307
802-658-2311
sellis@pfclaw.com


7670889_5:13527-00001

PAUL FRANK + COLLINS P C.
ATTORNEYS AT LAW
BURLINGTON, VERMONT